554

## Staunton.

CORAL GABLES CORPORATION AND AETNA CASUALTY
AND SURETY COMPANY v. ADA C. CLAY.

September 19, 1929.

Absent, West, J.

The opinion states the case.

*Cutchins & Cutchins*, for the appellants.

*S. Bruce Jones*, for the appellee.

CHICHESTER, J., delivered the opinion of the court.

The Coral Gables Corporation and the Aetna Casualty and Surety Company, hereinafter referred to as appellants, are here complaining of a decree of the

Corporation Court for the city of Bristol, Virginia, entered on the 30th day of March, 1928. The decree was in favor of Ada C. Clay, complainant in the court below, and hereinafter referred to as the appellee, or Mrs. Clay. The bill filed by the appellee prayed that the court would rescind a certain contract under which the appellee agreed to purchase, and did purchase, a lot in Coral Gables, Florida. The court in compliance with the prayer of the bill rescinded the contract and assessed costs against the appellants. It is from this decree that this appeal was duly taken. There is little dispute about the facts in the case.

Mrs. Clay, in company with her sister and her son, the latter having just graduated in dentistry, went to Florida with a view on the part of the son to establishing himself there as a dentist. Mrs. Clay went with her son to assist him in locating, and the evidence discloses that she had been to Florida a good many times before this trip. On arriving in Coral Gables, she was assigned to J. J. Lamb, a salesman, who showed her around and over the Coral Gables property. After looking over the property with Dr. Clay with a view to getting a suitable location for his office, appellee was shown a particular lot for residence purposes, which she agreed later to buy, and on June 28, 1926, she signed a "Sales Order" agreeing to purchase Lot 7, Block 87, of the Riviera section for the price of $3,900.00. The contract was written out by Mr. Lamb, acting for her, and the printed portion of it contained, in part, the following: "That if said property has been heretofore sold, or if for any reason the Coral Gables Corporation cannot deliver the above described property, or if this agreement to purchase or the contract for deed are not accepted by the Coral Gables Corporation, this agreement to purchase, together with the

contract for deed, will be cancelled and the money or consideration paid hereon will be refunded. * * * * * that the Coral Gables Corporation will not recognize, be liable for or be bound by any representations, promises, or special agreement not included herein."

On the back of this offer or "Sales Order" is written the following: "I hereby promise you that at the end of ninety days, should you care to dispose of Lot 7, Block 87, Riviera, I will take it off your hands at $3,900.00, paying you back all the money you have in it at said time." This was signed by J. J. Lamb, individually.

In connection with this "Sales Order" Mrs. Clay signed a note dated June 28, 1926, on the top of which appear the figures—"7 of 87 Country Club Part 5."

On March 18, 1927, counsel for appellee in looking over her papers for the purpose of instituting suit in the city of Norfolk, Virginia, against J. J. Lamb, who resided there, having refused to buy the lot from the appellee, found that there was a discrepancy between the description of the property as shown in "Sales Order" and as shown in the contract for a deed. In the first mentioned paper the property had been described as Lot 7, Block 87, Riviera, whereas in the contract for deed it had been described as Lot 7, Block 87, Country Club, Part 5, designations of the Coral Gables division. Before the discovery of the discrepancy, there had been considerable correspondence between the appellee and the Coral Gables Corporation with reference to the lot, and they all referred to the lot purchased as "Lot 7, Block 87 CC No. 5." This Lot 7, Block 87, was what is known as a resale lot, that is, it had been sold and the purchaser having failed to pay for it it was resold at a reduced price as all resale lots were. The appellee testified that she knew that the

lot she purchased was a resale lot and Lot 7, Block 87, Riviera, which had been sold previously was not a resale lot, and the purchaser was paying for it regularly.

It is charged that there was a fraud on the part of Lamb in the procurement of the contract; that he, without consulting the appellee, had changed the original contract from Lot 7, Block 87, Riviera, to Lot 7, Block 87, CC, Part 5. On this ground it was contended that the contract is voidable for fraud and mistake. The action of the court in so holding is charged as error. It is also charged by appellee that the contract was voidable under section 3848 (37) of the Code of Virginia of 1924, because made in violation of our blue sky law.

To meet the charge of fraud it is contended first, that Lot 7, Block 87 CC, 5, was the property actually purchased by the appellee and that the designation of it in the sales contract was a mistake of the scrivener acting for Mrs. Clay; that it was an innocent mistake and perpetrated no fraud upon the appellee. Second, it is further contended that Mrs. Clay, having accepted the deed to the property, in which the property is definitely described as Lot 7, Block 87, Country Club section No. 5, cannot be heard to say that she never read it over, and cannot be allowed to accept all of the privileges which might have accrued to her, had the Florida boom lasted a while longer, as the owner during the time which elapsed between her signing the contract and her repudiation of it and, after a long period of months, be allowed to say that she did not secure the property which she purchased and that the sale of the same was induced by fraudulent means.

The third contention is whether or not Mrs. Clay, by suing Mr. Lamb for damages caused by his failure to repurchase the lot which he had agreed to purchase,

did not elect that as her remedy and is now estopped from pursuing any other remedy.

The questions involved which go to the question of fraud are—

1. Did appellee purchase the lot known as Lot 7, Block 87, CC Part No. 5, or did she purchase the lot known and designated as Lot No. 7, Block 87, Riviera section.

2. Did the appellee affirm the contract of purchase of the Country Club lot by acceptance of the contract for deed and by making subsequent payments, or did she waive her alleged right to a recision of the contract when she instituted suit against J. J. Lamb.

As we view it, it is only necessary to consider the question of fraud and the effect of instituting suit by the appellee against J. J. Lamb, which the appellee did and recovered judgment against him. The ground upon which she recovered from Lamb was, as heretofore stated, that he had agreed in writing, endorsed on the sales order, to take it off her hands at the end of ninety days for the price of $3,900.00.

We do not think the charge of fraud is established with sufficient definiteness to justify recision of the contract on that ground. As was said in *Moore* v. *Gregory*, 146 Va. 504, 131 S. E. 692, at page 699, in confirmation of the rule which has long prevailed in this state: "Fraud is never presumed, but must be established by strong and clear, and convincing evidence." Citing *Cyphers* v. *Dingus*, 130 Va. 721, 108 S. E. 565.

The evidence is very clear that Mrs. Clay definitely purchased a lot; that she purchased the lot shown her by Mr. Lamb; that she purchased a lot at the resale price of $3,900.00; that she purchased it thinking she was getting a bargain and intended to live there, and

in the event her son did not settle in Florida, with the intention of selling it at a profit.

The entire evidence upon which the appellee undertakes to sustain a charge of fraud is as follows:

"Q. Could you locate this lot in Coral Gables now if you were there?

"A. Not to save my life.

"Q. Do you know on what street it was?

"A. I do not.

 * * * * * * * * *

"Q. Then why did you buy a lot in Coral Gables at thirty-nine hundred dollars with real estate in bad condition?

"A. I bought the lot because I thought possibly I would go there and Mr. Lamb said he would positively take it off of my hands if I did not come.

"Q. What did he say, if anything, with reference to the original price of this lot?

"A. He sold it to me at a resale and I don't know at what reduction, but it seems to me it was about half the price; it was a wonderful buy.

 * * * * * * * * *

"Q. I file herewith as exhibit number three collection receipt No. 44,872 in the amount of $910.00 and will ask you if that is the receipt which you received at that time?

"A. It certainly is.

 * * * * * * * * *

"Q. Did you read this contract when it was delivered to you?

"A. I did not, not a word of it.

"Q. Why didn't you?

"A. I just supposed it was correct as the rest had been and I knew what it was so I just signed it.

 * * * * * * * * *

"Q. Did you notice on those receipts that after the printed word section, there is typewritten the words CC No. 5?

"A. I never read a word on a receipt I got. I saw it was my receipt and folded it up and put it away."

Mrs. Clay then proceeded to give testimony as to the signing of the note for $910.00, which had written above it on the margin "7 of 87 Country Club Part 5." This she afterwards corrected as it was quite evident that the note was signed at a later period.

In her cross examination:

"Q. Do, you yourself, know which lot you purchased?

"A. I couldn't tell you to save my life.

"Q. So you really can't say that the Country Club section lot is not the lot that was actually shown you?

"A. No. I saw about five hundred lots and couldn't tell one from the other.

"Q. Were you near any physical things that would attract your attention?

"A. Not a thing.

"Q. And yet you bought?

"A. I bought because he said he could sell it and make a whole lot.

"Q. Then you speculated?

"A. No. I had nothing to speculate with. If my son went there I was going to put a house on the lot and live there and I told him if my son didn't come there I would not have a bit of use in the world for it."

The evidence will further show that on August 26, 1926, within a short time after the signing of the original sales order, the contract for deed was made out and was sent to Mrs. Clay's address, which at that time was Plant City, Florida. This was sent by registered letter and was signed for by her son. The

contract then found its way to Richmond in some manner which has not been definitely stated in the testimony, but apparently by having it forwarded by her son to her at her home in Richmond. Mrs. Clay testifies that Mr. Blenner brought it to her house in Richmond, Virginia, and that she signed it in the presence of her daughter, Mrs. Webb, and in the presence of Mr. Blenner, but that she did not read it.

■ There certainly rested upon the appellee the duty of reading the deed to see whether it correctly designated the property she bought, but she never seems to have discovered the error until her counsel in preparing to bring suit against J. J. Lamb noticed it. In his letter to the appellee her counsel said in part: "I enclose a copy of a letter I am writing the Coral Gables Corporation. The sales contract calls for a lot in the Riviera section but the contract for deed calls for a lot in the Country Club section. If you can get a map and ascertain whether these are identical lots or not I would appreciate it, so that we can see whether they have shifted your contract from one lot to another. If they have I expect we have a chance at them. In the meantime we will sue Mr. Lamb and see what happens."

Mr. Lamb testified that he showed the appellee a great number of lots in Coral Gables and that she particularly desired Lot 7, Block 87, C. C. section No. 5, because of its location with reference to buildings in the course of construction and because of its low resale value. He further testified that after the sales contract had been signed he took it to the sales department of the Coral Gables Corporation, and upon checking it up it was readily discovered that a mistake had been made by Mr. Lamb in writing the description of the property the word "Riviera" instead of "Country

Club section No. 5." As heretofore said the C. C. lot No. 5 was a resale lot, whereas the Riviera lot was not a resale lot. The alteration on the sales order was made in the office of the Coral Gables Corporation and the party making the correction attached his initials to the memoranda and pasted the original order on the back of the original as corrected.

We think the weight of the evidence is to the effect that the appellee got the lot she actually saw and agreed to purchase; that while the salesman made a mistake in filling out the sales contract it was a mistake which did not affect the rights of anyone. After the correction there was considerable correspondence between the appellee and the Coral Gables Corporation, and although the papers had been in the hands of the appellee on several occasions she appears by her conduct to have accepted the contract as changed. She signed the notes with the words Lot 7, Block 87, C. C. section No. 5, and by the execution and acceptance of the contract for the deed is alleged to have waived any error in the description of the lot in the sales contract. All of which it is urged is an acquiescense in the correction of the mistake.

Counsel for appellants indulges in quite a lengthy argument upon the question as to whether the signing of the note with the words Lot 7, Block 87, Country Club section No. 5, written on it, and the further acceptance and execution by her of a contract for a deed and the assumption of all rights conferred thereby, was an acquiescense in the correction of the mistake and an acceptance of Lot 7, Block 87, C. C. section No. 5.

It is unnecessary to pass upon this question in this opinion. It is ably argued by counsel for appellants and equally well argued by counsel for appellee, but the case, we think, fails since there was no fraud.

■ An interesting question is presented by oral and written argument as to whether appellee elected to stand on her contract for the purchase of the lot by suing Lamb for breach of his contract to repurchase. We think the position of the appellant is the correct one upon this point. Mrs. Clay cannot have the advantage of her contract as far as suing Lamb is concerned and then be released of any obligation on her part to take the lot which she bought. The ownership of which had to be in her before she could bring suit to make Lamb buy it back. She had the right to elect her remedies and if she desired to institute suit against appellants for the purpose of declaring the contract for deed a nullity for fraud or mistake she waived her right to sue Lamb. In that event, however, any obligation on the part of Lamb would immediately terminate. On the other hand if Lamb was obligated to buy back the property there had to be property subject to repurchase, and obviously it could not have been a lot which had been previously sold to someone else, which Mrs. Clay could not convey.

Under the facts of this case and the law applying thereto we think the suit by the appellee against Lamb was an election as between two remedies, and having pursued one she is thereby precluded from pursuing the other.

■ In *Fox* v. *Wilkinson*, 133 Wis. 337, 113 N. W. 669, 670, 14 L. R. A. (N. S.) 1107, at page 1109: "One having a right of choice between two inconsistent positions, who exercises that choice, is finally concluded and confined to the rights and remedies appropriate to the position so chosen, and excluded from those consistent only with the repudiated one. Since such choice is merely mental, any unambiguous act consistent with one and inconsistent with the other of the

elective positions will be deemed conclusive evidence of such election. *Smeesters* v. *Schroeder*, 123 Wis. 116, 101 N. W. 363."

See also *American Process Company* v. *Florida White Pressed Brick Company*, 56 Fla. 116, 47 So. 942, 16 Ann. Cas. 1054; *Benesh* v. *Travelers' Insurance Co.*, 14 N. D. 39, 103 N. W. 405; *American Woolen Company* v. *Samuelsohn*, 226 N. Y. 61, 123 N. E. 154; *Connihan* v. *Thompson*, 111 Mass. at page 272, where the court said: "The defense of waiver by election arises where the remedies are inconsistent; as where one action is founded on an affirmance, and the other upon the disaffirmance of a voidable contract, or sale of property. In such cases any decisive act of affirmance or disaffirmance, if done with knowledge of the facts, determines the legal rights of the parties, once for all. The institution of a suit is such a decisive act; and if its maintenance necessarily involves an election to affirm or disaffirm a voidable contract or sale, or to rescind one, it is generally held to be a conclusive waiver of inconsistent rights, and thus to defeat any action subsequently brought thereon. This is the doctrine of the cases in the New York reports cited by the defendant, and also of *Sanger* v. *Wood*, 3 Johns, Ch. [N. Y.] 416, 421. It is fully developed and explained by Chief Justice Shaw in *Butler* v. *Hildreth*, 5 Met. Mass.] 49. See also *Kimball* v. *Cunningham*, 4 Mass. 502 [3 Am. Dec. 230]; *Gardner* v. *Lane*, 98 Mass. 517; *Hooker* v. *Hubbard*, 97 Mass. 175."

The Supreme Court of the United States in the case of *Robb* v. *Vos*, 155 U. S. 13, 15 S. Ct. 4, 14, 39 L. Ed. at page 62, quotes with approval from *Conrow* v. *Little*, 115 N. Y. 387, 22 N. E. 346, 5. L. R. A. 693, as follows: "The contract between Branscom and the plaintiffs was, upon the discovery of Branscom's fraud, voidable at

their election. As to him, the plaintiff could affirm or rescind it. They could not do both, and there must be a time when their election should be considered final. We think that time was when they commenced an action for the sum due under the contract, and in the course of its prosecution applied for and obtained an attachment against the property of Branscom as their debtor."

See also *Heckscher, et al.,* v. *Blanton, et al.,* and *Heckscher* v. *J. Thompson Brown & Company,* 111 Va. 648, 66 S. E. 859, 69 S. E. 1045, 37 L. R. A. (N. S.) 923; note in 4 L. R. A. at page 145, and note in 8 L. R. A. at page 216.

We conclude that there was no fraud committed upon the appellee which would justify a recision of the contract and that the appellee elected her remedy which she pursued with success against Lamb for failure to comply with his re-purchase contract.

The Statute, Code 1924, section 3848 (28), known as the blue sky law, has no application to the facts of this case. It has not been shown in any sense that B. A. Blenner was the agent of the Coral Gables Corporation, and we cannot assume that he was, without proof, nor is there any other violation of the blue sky law shown by the record.

We are therefore of opinion to reverse the case, and this court will enter a decree dismissing the bill at the cost of the plaintiff.

*Reversed.*